DECISION.
This case has been sua sponte removed from the accelerated calendar.
{¶ 1} Plaintiff-appellee Kelly Dewatering Construction Co. ("Kelly") filed a complaint against defendant-appellant R.E. Holland Excavating Co. ("Holland") for breach of contract, quantum meruit, and unjust enrichment. In its complaint, Kelly asserted, among other things, that it was entitled to the $43,194.60 bond issued by defendant Ohio Farmers Insurance Co. (Holland's surety) and held in escrow by defendant-appellees the city of Cincinnati and the Hamilton County Board of Commissioners.
 {¶ 2} A bench trial was conducted on July 23, 2002. Following the trial, the court entered judgment in favor of Kelly and against Holland and Ohio Farmers Insurance in the amount of $47,743.14, plus costs and interest. The court also ordered the city of Cincinnati and the Hamilton County Board of Commissioners to release the bond funds to Kelly.
 {¶ 3} Holland has appealed, raising two assignments of error. In the first assignment of error, Holland maintains that the trial court erred in interpreting its contract with Kelly. In the second assignment of error, Holland contends that the trial court erred in finding that Kelly had proved its damages. We find neither assignment to be well taken.
 {¶ 4} The relevant facts are as follows. Holland is an excavation contractor that installs sanitary sewer lines and systems. Kelly installs deep-well dewatering systems that lower the water table using high-capacity pumps so that work can be performed in excavated areas. Holland was awarded a contract by the Metropolitan Sewer District to install a sewer line for the Springdale/Sharonville Sewage Project. The water level in the area needed to be reduced before the sewer line could be installed. In November 1999, Kelly submitted an offer to Holland for the services and equipment necessary to lower the water level. On February 14, 2000, Holland responded by issuing a purchase-order contract to Kelly outlining the terms and conditions under which it would do business with Kelly. Kelly's original bid was attached to and incorporated into the contract. Kelly accepted the purchase order.
 {¶ 5} The purchase-order contract specified that, for a base price of $66,450 (there was a $225-per-day charge for additional pumping), Kelly's work for Holland would include the following:
 {¶ 6} "1. Drill and install necessary deep wells.
 {¶ 7} "2. Furnish and install necessary well screens.
 {¶ 8} "3. Furnish and install 15 submersible pumps and risers.
 {¶ 9} "4. Furnish and install necessary discharge hose to connect wells to Mill Creek.
 {¶ 10} "5. Furnish 3,300 of overhead power line.
 {¶ 11} "6. Provide standby pump and exchange of pumps that may become inoperative.
 {¶ 12} "7. Supervision of installation of partial system.
 {¶ 13} "8. Development of testing of system.
 {¶ 14} "9. Freight of equipment to and from jobsite.
 {¶ 15} "10. We are providing insurance coverage for general liability and automobile coverage in the amount of one million dollars per occurrence. We have a two million-dollar umbrella for increased limits of coverage.
 {¶ 16} "11. No builders' risk policy coverage is provided."
 {¶ 17} The contract further provided that Holland was to be "responsible for damage, theft, or loss of [Kelly] equipment from jobsite," and that the charges for equipment usage would terminate "at the time the equipment is available to be loaded on [Kelly] trucks."
 {¶ 18} Kelly delivered the specified equipment to Holland and installed pumps at the excavation site around the end of April 2000. According to Lester Ehorn, the project manager for Kelly, his team tested the dewatering system without turning it on. The system was then activated by Holland on May 11, 2000, and remained on for five days. On May 18, 2000, the Kelly crew left the excavation site. The pumps were activated again on May 25, 2000, and ran for five days until May 30, 2000. Due to a delay caused by problems arising from Holland's choice of where to excavate, the pumps were not turned on again until July 24, 2000, and they ran continuously until February 12, 2001. According to Holland's superintendent, James Coate, all of Kelly's equipment was not ready to be picked up until April 2, 2001. And both parties agreed that it was, in fact, picked up on that date.
 {¶ 19} Kelly invoiced Holland for the specified contract price of $66,450, and for five additional months of usage at $225 per day. The additional charges amounted to $31,050. Ehorn testified at trial that, due to an error in computing the day the equipment had been returned, seven days should have been credited to Holland, which reduced the charges to $29,475. Kelly also charged a retainage fee of $7218.60 and an additional fee of $4926 for damage to several of its fifteen-horsepower motors. Upon receiving all the invoices, Holland paid $68,231.40, but refused to pay the additional charges of $41,619.90 for the additional five months of usage, the retainage fee, and damages.
 {¶ 20} In its first assignment of error, Holland maintains that the trial court improperly interpreted the contract because the contract was unambiguous. We note that Holland initially argued below that the contract was ambiguous and asked the court to "interpret certain provisions of [the] contract" at trial. Holland now contends that the contract was not ambiguous. Despite Holland's inconsistent arguments, we must review whether the terms of the purchase-order contract were ambiguous or whether they should have been enforced as a matter of law.
 {¶ 21} Where a contract is clear and unambiguous, its interpretation is a matter of law.[1] In such a case, the standard of review is de novo.[2] But where a contract is ambiguous, the meaning of the words in the contract becomes a question of fact, and the trial court's interpretation will not be overturned on appeal absent a showing that the court abused its discretion.[3] A contract is ambiguous if its terms cannot be clearly determined from a reading of the entire contract or if its terms are susceptible to more than one reasonable interpretation.[4]
 {¶ 22} In this case, Holland maintains that it only used the pumps for seven months, from July 24, 2000, to February 12, 2001, and that, as a result, it should only have been charged for one month of additional pumping services. Holland contends that it should not have been charged when the pumps were being tested in May 2000, or when the pumps were unused in June and part of July 2000, and in March and April 2001. Conversely, Kelly justifies charging Holland for an additional five months of usage because the contract was for goods and services.
 {¶ 23} The term at issue in this case is "pumping." The purchase order, which was written by Holland, provided that Kelly would install a deep-well dewatering system. The "Price for pumping for 6 months * * * $66,450.00 * * * Price/day for additional pumping * * * $225." Kelly's bid, which had been incorporated into the contract, outlined services other than pumping that would be provided by Kelly. Kelly's proposal included "install[ing] a deep well dewatering system"; drilling and installing deep wells, well screens, pumps, risers, discharge hoses, and a power line; providing a standby pump and some insurance coverage; installing a partial system; developing and testing the system; and transporting the equipment to and from the site.
 {¶ 24} At trial, the court permitted the admission of parol evidence relating to the intent of the parties when they negotiated and wrote the agreement. After the trial, the court determined the following with respect to the term "pumping": "The agreement between the parties provided that the six month cost for the goods and services was $66,450.00, and $225.00 per day over and above six months." It appears from the trial court's findings of fact and conclusions of law that it felt there was an ambiguity in the contract.
 {¶ 25} Having reviewed the contract, we come to the same conclusion. Looking only at the purchase order and employing a narrow interpretation of the provision as Holland suggests, the term "pumping" could reasonably be interpreted to cover services for only the actual act of "pumping." Looking at the bid and employing a broader interpretation of the provision as Kelly suggests, the term "pumping" could reasonably be construed to cover goods and services for Kelly's installation of the dewatering equipment. Thus, given the ambiguity between the services provided in the purchase order and the services outlined in the bid, the intent of the parties cannot be determined from the contract as a matter of law. Because the contract was reasonably susceptible to two different meanings and the intent could not be determined from the written terms alone, we hold that the contract was ambiguous.
 {¶ 26} Where a contract is ambiguous, the trial court must determine the meaning of ambiguous terms, and parol evidence is admissible to interpret and construe those terms.[5] It is well established that where there is ambiguity in the contract, it must be strictly construed against the party who prepared it.[6] And judgments supported by competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence.[7] We must indulge every reasonable presumption in favor of the trial court's judgment and its underlying findings of fact.[8] In the event the evidence is susceptible to more than one interpretation, we must give deference to the trial court's credibility determinations.[9]
 {¶ 27} At trial, parol evidence concerning "pumping" was admitted, and it was conflicting. After reviewing the evidence, we conclude that the trial court had an adequate evidentiary basis upon which to determine that the intended meaning of the term "pumping" covered all goods and services provided by Kelly. Ehorn testified that the intent of the contract was to provide for the installation of a dewatering system capable of lowering the water level. Ehorn testified that Holland was responsible for lowering the water level by turning the pumps on or off as appropriate. He stated that, under the contract, Holland could use the dewatering equipment for six months, and, after that time, Holland was to be charged for the additional use of Kelly's equipment. Ehorn defined "pumping" as "availability of [Kelly's] equipment on a contractor's site and/or use of that equipment." Finally, Ehorn testified that pumping began on May 11, 2000, and continued until April 2, 2001. While Holland offered conflicting evidence, we cannot say that the trial court abused its discretion in finding Ehorn's testimony to be more credible, particularly where Holland created the ambiguity by requesting services for "pumping" in the purchase-order contract.
 {¶ 28} Holland also maintains that the trial court erred in awarding damages to Kelly for damage to the pumps. Despite Holland's assertions to the contrary, the contract clearly provided that Holland "[wa]s responsible for damage, theft, or loss of [Kelly] equipment from [the] jobsite." Thus, under the plain language of the contract, damages to Kelly's equipment were chargeable to Holland. As a result, we overrule the first assignment of error.
 {¶ 29} In its second assignment of error, Holland contends that the trial court erred in awarding damages because they were speculative and not definitely proved. The contract was clear that Holland was responsible for alerting Kelly when the equipment would be ready for pickup. Coate testified that all of Kelly's equipment was not ready to be picked up before April 2, 2001. Both Coate and Ehorn testified that Kelly recovered the equipment on April 2, 2001. As a result, we hold that the damages were definite, and that the trial court did not err in awarding damages. We, therefore, overrule the second assignment of error and affirm the judgment of the trial court.
Judgment affirmed.
Sundermann, P.J., Hildebrandt and Winkler, JJ.
[1] See Nationwide Mutual Fire Ins. Co. v. Guman Brothers Farm (1995),73 Ohio St.3d 107, 108, 652 N.E.2d 684; Ohio Historical Society v.General Maintenance Engineering Co. (1989), 65 Ohio App.3d 139,146, 583 N.E.2d 340.
[2] See Nationwide Mutual Fire Ins. Co. v. Guman Brothers Farm,
supra.
[3] See Ohio Historical Society v. General Maintenance EngineeringCo., supra, at 146-147.
[4] See United States Fid. Guar. Co. v. St. Elizabeth Med. Ctr.
(1998), 129 Ohio App.3d 45, 55, 716 N.E.2d 1201.
[5] See Ohio Historical Society v. General Maintenance EngineeringCo., supra, at 146.
[6] See, e.g., McKay v. Mach. Co. v. Rodman (1967), 11 Ohio St.2d 77,80, 228 N.E.2d 304.
[7] See C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279,376 N.E.2d 578, syllabus.
[8] See Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80,461 N.E.2d 1273.
[9] See id.